DREW ASSOCIATES OF N.J., L.P., A NEW JERSEY LIMITED PARTNERSHIP, PLAINTIFF-APPELLANT, v. RANIERO TRAVISANO, CLERK OF MIDDLESEX COUNTY, DEFENDANT, AND NEW JERSEY DEPARTMENT OF COMMUNITY AFFAIRS, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 24, 1989—Decided July 17, 1989.

198

Before Judges PETRELLA, GRUCCIO and LANDAU.

*Gage Andretta* argued the cause for appellant (*Kimmelman, Wolff & Samson,* attorneys; *Bruce Dickstein* on the brief).

*Daniel P. Reynolds,* Deputy Attorney General argued the cause for respondent (*Peter N. Peretti, Jr.,* Attorney General, attorney; *Mary C. Jacobsen,* Deputy Attorney General, of counsel; *Daniel P. Reynolds* on the brief).

The opinion of the court was delivered by

LANDAU, J.A.D.

Plaintiff-appellant Drew Associates of N.J., L.P. (Drew) appeals from entry of summary judgment in favor of the defendant-respondent the New Jersey Department of Community Affairs (DCA) in its suit challenging the constitutionality of The Cooperative Recording Act of New Jersey (Act), *N.J.S.A.* 46:8D–1 *et seq.*

Drew, a limited partnership that owns a multi-unit apartment building which is to be converted into a cooperative, filed an order to show cause and a verified complaint on May 5, 1988 against Travisano and DCA to enjoin enforcement of the Act and have it declared unconstitutional.

Prior to the return date of the order, the trial judge granted Drew's petition to convert the action into a motion for summary judgment. DCA cross-motioned for summary judgment. *See R.* 4:46.

On October 7, 1988, the trial judge held that the Act was constitutional, and granted DCA's cross-motion for summary judgment. In an oral opinion rendered on October 7, the trial judge stated that the classifications established under the Act were reasonable and thus not violative of equal protection; that the imposition of the realty transfer fees did not constitute a double tax; that although certain provisions could have been drafted more carefully, the Act was not violative of due process; and that the provision requiring consent of a coopera-

tive's board of managers before transfer of an individual unit was not an unreasonable restraint on alienation when considered in light of the entire Act.

The Act became effective on May 7, 1988, and applies only to cooperatives which come into existence after that date.[1] The Act defines "cooperative" as:

[A]ny system of land ownership and possession in which the fee title to the land and structure is owned by a corporation or other legal entity in which the shareholders or other coowners each also have a long term proprietary lease or other long term arrangement of exclusive possession for a specific unit of occupancy space located within the same structure. [*N.J.S.A.* 46:8D–3(f).]

See also *Bluvias v. Winfield Mut. Housing,* 224 *N.J.Super.* 515, 522 (App.Div.1988), certif. granted, 111 *N.J.* 621 (1988), app. dism. 114 *N.J.* 589 (1989). It creates a title registration system for recording and taxing the creation and transfer of ownership in cooperative units. *See Presten v. Sailer,* 225 *N.J.Super.* 178, 184 & n. 2, 189 n. 6 (App.Div.1988). The Act also requires lenders who acquire a security interest in a cooperative to record the lien under applicable laws and on the master register for the cooperative. *N.J.S.A.* 46:8D–14.

The underlying purpose of this remedial measure is stated in the Act:

The Legislature finds that issuance of proprietary real estate leases by cooperative corporations and other cooperative legal entities is becoming a popular practice in New Jersey which is usually accomplished by a ledger book transfer to the lessee of stock or another indicia of ownership of an interest in the cooperative corporation or other cooperative entity which owns the real estate and that there is no public record of the transaction. The Legislature further finds that this is a hybrid transaction which is not capable of classification entirely as realty or personalty but that the public perception of a cooperative unit is that it in some manner involves real estate; that members of the public seek protection in cooperative leasing transactions similar to those protections available in transactions for the purchase of real estate, namely, a public title record, title searches to guarantee security of title, freedom from

---

1A proposed amendment was introduced to permit cooperatives in existence prior to the effective date of the Act to elect to have the provisions of the Act extended to encompass it by filing a master declaration pursuant to *N.J.S.A.* 46:8D–6. *Senate,* No. 2525 (May 16, 1988). No such legislation has been adopted as of the filing date of this opinion.

easements or rights in unknown third parties, unpaid liens, unsatisfied judgments, unpaid taxes, freedom from municipal violations, title insurance and the equivalent of a mortgage where a cooperative unit is the asset to be pledged as security for the purchase loan. The Legislature declares that enabling legislation in the form of a cooperative recording act is desirable because it would provide a title registration system for cooperative units and would provide additional revenue to county recording offices and to the State of New Jersey by applying the Realty Transfer Tax to proprietary leases issued by cooperatives and assignments thereof which are not presently covered by that tax. [*N.J.S.A.* 46:8D–2.]

The recording requirements of the Act are administered by the clerk of the county or counties in which the creation and transfers are recorded. *N.J.S.A.* 46:8D–5. The DCA, which is responsible for the registration of planned real estate developments, such as cooperatives, under The Planned Real Estate Development Full Disclosure Act, *N.J.S.A.* 45:22A–21 *et seq.*, also has certain duties with regard to the Act's implementation. *N.J.S.A.* 46:8D–18(a).

Pursuant to the Act, the creation of a new plan of cooperative ownership requires the recording of a master declaration and a master register. *N.J.S.A.* 46:8D–5 to –7. The master declaration must include, among other things: a legal description of the land to be dedicated to cooperative ownership; a copy of the recorded deed which vests ownership in the person who signs the master declaration to create the cooperative; the bylaws governing the cooperative; a statement of existing financing which is a lien on the cooperative and the manner in which such lien will be discharged before and after closing on individual cooperative units; a schedule of each owner's percent of common elements which constitute part of such ownership shares and which reflects common expenses and surplus; a written description and scaled architectural plans of the cooperative; and such other provisions as may be desired, including reasonable and lawful restraints on transfer and use. *N.J.S.A.* 46:8D–6. The master register requires a list of the names and addresses of individual unit owners and/or occupants, as well as separate identification of each unit by letter, name, number or a combination thereof. *N.J.S.A.* 46:8D–7.

The Act also provides for termination of a cooperative plan by the filing of a deed of revocation. *N.J.S.A.* 46:8D–16. Termination under this provision, however, does not preclude subsequent resubmission of the property as a cooperative pursuant to the Act. *N.J.S.A.* 46:8D–17.

Prior to adoption of the Act, no specific New Jersey statutes regulated the establishment and method of governance of cooperatives. *Bluvias,* 224 *N.J.Super.* at 522.

Drew urges that the Act deprives it of due process because it is arbitrary, irrational, confusing and vague, and that the Act violates its equal protection rights by creating an invalid distinction between new and existing cooperatives that bears no rational relation to the objectives of achieving certainty in title and raising revenue. Drew also says that by treating the distribution of shares of a cooperative as realty subject to transfer and recording fees, the Act imposes an impermissible double tax; and that *N.J.S.A.* 46:8D–11(g), which requires consent by a cooperative's board of managers to transfer of an individual unit, contains no standards to govern consent and is contrary to the policy that real estate be freely alienable.

I.

## DUE PROCESS

Drew asserts that the Act is arbitrary because the information to be contained in the public recording is duplicative or unnecessary. It argues that the Act would create confusion by permitting a lender's lien to be recorded against both the deed of the cooperative association and the shareholder's unit interest, giving rise to competing first mortgages. Drew also says that the possibility of foreclosure by the unit owner's lender creates the prospect of partition of the individual unit owner's interest and thus destruction of the cooperative association itself. It further urges that the Act is unconstitutional because of the uncertainty involved in determining the consideration upon which the transfer tax is based, and because the Act

incorrectly presupposes that the cooperative's financial status can be determined accurately on any given day. It also says that the effect of the Act's revocation provision is unclear.

The Fourteenth Amendment of the Federal Constitution and Article I, Paragraph 1 of the New Jersey Constitution protect against unjustified state regulation of individual rights. *Greenberg v. Kimmelman*, 99 *N.J.* 552, 562, 568 (1985). *See also Katobimar Realty Co. v. Webster*, 20 *N.J.* 114 (1955). Generally, if a statute is "reasonably related to a legitimate legislative purpose and is not arbitrary or discriminatory," it is not violative of due process. *Greenberg*, 99 *N.J.* at 563 (citing *Nebbia v. New York*, 291 *U.S.* 502, 537, 54 *S.Ct.* 505, 516, 78 *L.Ed.* 940, 957 (1934)).

A statute is presumed constitutional and the burden is on the person challenging it to prove otherwise. *Piscataway Tp. Bd. of Ed. v. Caffiero*, 86 *N.J.* 308, 318, (1981), app. dism. 454 *U.S.* 1025, 102 *S.Ct.* 560, 70 *L.Ed.*2d 470 (1981). Moreover, a reviewing court should not consider the wisdom of the legislative decision, but only whether the action is within constitutional limitations. *Id.* If a statute does not violate the Constitution but is merely unwise or based upon bad policy, it is not for the court to question. *Id. See also Town Tobacconist v. Kimmelman*, 94 *N.J.* 85 (1983).

So viewed, Drew's due process claims are clearly without merit. *R.* 2:11-3(e)(1)(E). Additionally, we note that although other sources, both public and private, are available for determining relevant information concerning a cooperative unit's title and status, the Legislature could conclude that establishment of a public recording system which would allow prospective purchasers to invest in cooperative units with confidence is a legitimate legislative purpose. *See generally Sec. Pac. Fin. Corp. v. Taylor*, 193 *N.J.Super.* 434, 440 (1984).

The Legislature found that the public perceives the purchase of cooperative units to involve real estate. Thus, affording protections similar to those afforded purchasers of more tradi-

tional real estate interests, by including cooperative ownership within a public recording system, is constitutional. Although cooperative ownership is hybrid and *sui generis, N.J.S.A.* 46:8D-2; *Presten,* 225 *N.J.Super.* at 187, prior to adoption of the Act our Legislature accepted the characterization of cooperative housing interests as more akin to realty than to personalty, *Presten,* 225 *N.J.Super.* at 186-188. Moreover, cooperative shareholders generally perceive themselves to be homeowners and the public considers their interests in cooperatives to represent interests in real estate. *Id.* at 189-190 and authorities cited therein.

As noted by the Act's purported draftsman,[2] the advantages sought to be attained include:

* Security of title that there is no claim by a predecessor in title as to a superior lien, claim or title.

* Security that there is no easement or right vested in another person which will detract from unrestricted use and possession of the dwelling unit.

* Security that the unit has not been pledged for a loan or attached by execution or levy due to claim of any creditor or lienor.

* Security that there are no unpaid real property taxes, no municipal violations, private or public assessments, orders or restrictions in force which adversely affect the unit.

Prior to the Coop Recording Act, the only ownership track for a coop unit was the private stock ledger maintained by the coop corporation. Further, none of the four items discussed above could be treated in any satisfactory manner because there was no public record for ownership of a coop unit. This led to results contrary to the public interest, as follows:

* A municipal tax assessor could not effectively assess a coop building because there was no record of the transfer of coop units. For example, if a coop unit was sold at an insider price of $40,000, sold six months later for $70,000, and again one year later for $85,000, the tax assessor would never know more than the initial sale of $40,000. The succeeding sales were private. Omission of a record of future transactions results in an artificially low

---

[2] According to an article in the New Jersey Law Journal, Gerald S. Meisel, a real estate attorney and chairman of the Bergen County Bar Association Coop/Condo Committee, wrote the Act and submitted it to the Board of Trustees of the Bergen County Bar Association. The Board endorsed the Act and sent it to Assemblyman W. Kern and Senator M. Feldman, who thereafter introduced the Act in their respective houses. *Meisel,* "A Look at the Coop Recording Act—and a Proposed Form," 122 *N.J.L.J.* 1130, 1130 (Oct. 27, 1988).

assessment for the building based only on the initial sale. A public record of sales affords municipalities a realistic opportunity to assess coop buildings that continue to increase in value as units are sold and resold.

 * Title companies confirmed that a title gap existed on the resale of a coop unit because there is no chain of title. This act makes it possible for consumers to obtain title insurance when they purchase a coop unit.

 * At a January 1986 joint seminar of the Banking and Real Property committees of the Bergen County Bar, with many major mortgage lenders present, it was noted that New Jersey lenders were not making loans for purchase of coop units due to the absence of a lien recording system that would provide priority of lien equivalent to a mortgage on a condominium unit. This legislation cures that problem by removing the obstacle and, thus, encouraging lenders to give purchase money loans to consumers for purchase of cooperative units.

 The Coop Recording Act resolves these problems by creating a title registration system so that transfer of a coop unit would, for the first time, become a matter of public record. It also amends the recording act to include cooperative transfers as triggering imposition of the realty transfer fee for each recorded coop transfer. [*Meisel*, "A Look at the Coop Recording Act—and a Proposed Form," 122 *N.J.L.J.* 1130, 1130 (Oct. 27, 1988) (footnote omitted).]

As to Drew's concern about the filing of a deed of revocation, *N.J.S.A.* 46:8D–16 provides:

Any cooperative property may be removed from the provisions of this act by a deed of revocation duly executed by all unit lessees or the sole owner of the property and the holders of all mortgages or other liens affecting all units and recorded in the master register.

The provision is part of Article 5 of the statute, entitled "Termination of the Cooperative Plan of Ownership." (That heading was enacted as part of the Act.) This section of The Cooperative Recording Act substantially parallels *N.J.S.A.* 46:8B–26 of the Condominium Act which provides for termination of condominium status by filing a deed of revocation. *N.J.S.A.* 46:8B–27 of the Condominium Act stipulates that upon such a filing, unit owners of condominiums "become tenants-in-common, unless otherwise provided in the master deed or deed of revocation." A similar provision as to the effect of filing a deed of revocation was also included in Article 5 of The Cooperative Recording Act as introduced in the Assembly. It stated:

18. (New Section) Upon the recording of a deed of revocation, the unit lessees recorded in the master register as of the date of the recording of the deed shall become tenants-in-common of the property unless otherwise provided in the master deed or deed of revocation; each unit owner shall thereafter be the owner of an undivided interest in the property equal to the percentage of

his undivided interest in the common elements before the recording of the deed of revocation, and each lien of an individual unit shall become a lien on the individual undivided interest of the unit owner in the entire property. [Assembly, No. 344 (Pre-filed for introduction in the 1986 Session).]

This provision, however, was not contained in the Act as finally adopted. *See N.J.S.A.* 46:8D–16 to –18.

■ Based upon the plain language of the Act, coupled with the legislative contemplation that filing a deed of revocation would "terminate" the cooperative ownership and transform it into another form of real property ownership, the trial judge correctly determined that under *N.J.S.A.* 46:8D–16 a cooperative ceases to exist upon such a filing.

## II.

### DOUBLE TAXATION

Drew complains that the Act improperly treats the distribution of shares of the cooperative as realty subject to transfer and recording fees, and thereby unfairly imposes a double tax. *See N.J.S.A.* 46:8D–2, –8, –13; *N.J.S.A.* 46:15–5 *et seq.* It says that a real estate transfer tax would be imposed both when a cooperative corporation initially purchases real property, and again when each cooperative owner buys shares which constitute ownership of the cooperative units. It urges that as cooperative corporations retain fee title after shares to individual units are distributed, a transfer fee should be assessed only upon conveyance of the entire fee, thereby treating acquisition of the property and the distribution of shares entitling an individual to a unit as a "unitary transaction." Finally, Drew argues that, by contrast, condominium owners are only subject to a single tax because the condominium association does not have any interest in individual condominium units. *See Flowers*, "Recording of Co-ops: The New Requirements," 121 *N.J. L.J.* 640, 657 (March 31, 1988).

■ As a general rule, duplicate taxation of the same property in different forms, if in accordance with statute, is not

invalid. *See Old Dominion C.M. & S. Co. v. State Bd. Taxes,* 91 *N.J.L.* 173, 178–179 (E. & A.1917); *Jersey City Gaslight Co. v. Jersey City,* 46 *N.J.L.* 194, 196 (E. & A.1884); *Gritzmacher v. Taxation Div. Director,* 2 *N.J.Tax* 489, 492 (1981). *See also In re Estate of Romnes,* 79 *N.J.* 139, 164 (Handler, J., dissenting).

Here, there is no double taxation as the transfer tax is imposed pursuant to the Act upon separate owners on distinct transfers at different times. Indeed, even if this were deemed to be double taxation, the Legislature may constitutionally impose a duplicate tax, although courts generally endeavor to avoid such a statutory construction where the legislative intent is questionable. The language of *N.J.S.A.* 46:8D–2, however, is clear as to imposition of the transfer taxes. Even if it were deemed to produce true duplicate taxation, the Legislature's constitutional power to enact such a statute must be recognized. *See Old Dominion,* 91 *N.J.L.* at 178–179; *Jersey City Gaslight,* 46 *N.J.L.* at 196.

■ Drew's reliance upon the different tax burdens legislatively placed upon condominiums may be of interest to the Legislature as a matter of policy. However, as condominiums differ from cooperatives in the manner of their creation, the nature of the individual interests acquired and the regulations imposed thereon, *see Bluvias,* 224 *N.J.Super.* at 522–523, the Legislature may constitutionally elect to accord different tax treatment to transfer of interests in each.

## III.

### RESTRAINT ON ALIENATION

*N.J.S.A.* 46:8D–11(g) provides in pertinent part:

The sale or transfer of a cooperative share by a proprietary lease or an assignment thereof or other like instrument is achieved by the recording of the transfer document or a short form memorandum thereof which is executed and acknowledged in recordable form and which contains the following information:

. . . .

An executed and acknowledged consent of the cooperative board of managers authorizing and approving the transfer or assignment.

Drew argues that to require consent to transfer by a cooperative board, without providing standards to govern such consent, is irrational and contrary to the public policy that real estate should be freely alienable.

We recognize that to give tenants a voice in the selection of prospective tenants, the bylaws or certificate of incorporation of cooperatives frequently provide that leases may not be assigned nor shares in the corporation transferred without consent of the board of directors or a stipulated proportion of the tenants. *See* 15A *Am.Jur.*2d, *Condominiums and Co-operative Apartments*, § 82 at 913; *Transfer of, and voting rights in, stock of co-operative apartment association*, 99 *A.L.R.*2d 236, 238 (1965). Such restraints, if reasonable, have been upheld. 15A *Am.Jur.*2d, *supra*, at 915. Transfers in violation of such restraints can be rejected by the cooperative corporation. *Id.; 1165 Fifth Ave. Corporation v. Alger*, 288 *N.Y.* 67, 41 *N.E.*2d 461 (1942).

*N.J.S.A.* 46:8D–11(g) "formalizes the prior practice of obtaining an unnotarized consent letter from the board and eliminates possible future challenge to either the terms of the consent [or] the authority of the signatory to execute the consent. Thus, signing of the consent in recordable form is another protection for the buyer of the unit." *Meisel, supra*, at 1131. To afford such protection, *N.J.S.A.* 46:8D–11(g) requires an executed and acknowledged consent by the board of managers of the cooperative when consent is mandated by the cooperative bylaws or certificate of incorporation. It is not applicable when a consent requirement is not contained in the bylaws or certificate of incorporation.

As a cooperative corporation has the power reasonably to reject transfers, it was appropriate for the Legislature to include such a provision, paralleling the unquestioned right of condominium owners to impose restrictive covenants which do not offend constitutional or legal rights. The enactment safe-

guards purchasers who, after consulting public recording records and purchasing a unit in reliance upon the statutory procedure, are then confronted with a situation where the cooperative association rejects the transfer of stock. The statute requires that consent by the cooperative corporation may not be withheld unreasonably. *See N.J.S.A.* 46:8D–6(*l*); *Town Tobacconist*, 94 *N.J.* at 104. Thus, we conclude that Drew's assertion that the Act is contrary to the policy that real estate be freely alienable is without basis. *R.* 2:11–3(e)(1)(E).

## IV.

### EQUAL PROTECTION

Drew argues that even if protection of purchasers and the raising of revenue are legitimate goals, the statute unconstitutionally creates a classification of cooperatives created after May 7, 1988 which bears no rational relation to that objective.

■ Article I, Paragraph 1 of the New Jersey Constitution and the Fourteenth Amendment of the Federal Constitution require that the Legislature "write evenhandedly" to treat alike persons who are similarly situated. *Greenberg*, 99 *N.J.* at 562; *Peper v. Princeton University Board of Trustees*, 77 *N.J.* 55 (1978). The Legislature, however, has broad discretion to determine the perimeters of a classification, and "distinctions may be made with substantially less than mathematical exactitude." *Paul Kimball Hosp. v. Brick Tp. Hosp.*, 86 *N.J.* 429, 446–447 (1981); *Barone v. D. of Human Serv., Div. of Med. Asst.*, 210 *N.J.Super.* 276, 288 (App.Div.1986), aff'd 107 *N.J.* 355 (1987).

■ Under the Federal Constitution, equal protection analysis encompasses a three-tier approach. *Matthews v. Atlantic City*, 84 *N.J.* 153 (1980); *Barone*, 107 *N.J.* at 368. When a legislative enactment regulates a fundamental right or suspect class it is subject to strict scrutiny, and the state must prove that a compelling need justifies the measure and that no less restrictive alternatives are available to accomplish that

objective. *San Antonio School District v. Rodriguez*, 411 *U.S.* 1, 16–17, 93 *S.Ct.* 1278, 1287–88, 36 *L.Ed.*2d 16, 33 (1973), reh'g den. 411 *U.S.* 959, 93 *S.Ct.* 1919, 36 *L.Ed.*2d 418 (1973); *U.S.A. Chamber of Commerce v. State*, 89 *N.J.* 131, 157–158 (1982). Intermediate scrutiny is required when a semi-suspect classification is regulated. To be upheld under these circumstances, the enactment must serve important governmental objectives and its classification must be substantially related to achievement of those objectives. *Bullock v. Carter*, 405 *U.S.* 134, 144, 92 *S.Ct.* 849, 856, 31 *L.Ed.*2d 92, 100 (1972); *U.S.A. Chamber of Commerce*, 89 *N.J.* at 158. In all other situations, the provision must be supported by a conceivable, legitimate state objective and the classification it makes must be rationally related to that objective. *U.S.A. Chamber of Commerce*, 89 *N.J.* at 158.

 An equal protection claim under the New Jersey Constitution must be evaluated independently. *Barone*, 210 *N.J.Super.* at 289. In analyzing equal protection claims under the New Jersey Constitution, state courts have frequently applied a standard of review similar to that applicable to the Federal Constitution. *Right to Choose v. Byrne*, 91 *N.J.* 287, 305 (1982). Equal protection analysis under the New Jersey Constitution requires consideration of "whether there is an appropriate governmental interest suitably furthered by the differential treatment" at issue. *Barone*, 107 *N.J.* at 355. It is necessary to balance "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." *Id.*

 A statute is presumed to be constitutional and should be construed where possible to promote its constitutionality. *Right to Choose*, 91 *N.J.* at 311; *Piscataway*, 86 *N.J.* at 318. The burden is on the party challenging a statute to prove otherwise. *Piscataway*, 86 *N.J.* at 318.

Article 3 of the Act, regarding transfer and transfer fees, was originally drafted to apply to both pre and post-Act cooperatives, and Article 2, concerning creation of a cooperative by

filing a master registration and master declaration, was drafted to apply only to post-Act cooperatives. *Meisel, supra,* at 1130–1131. *See also supra* note 2. As noted by the drafter:

> Section 20 of the act states: "This act applies to all cooperatives created within this State after the effective date of this act." The intent of that provision was to apply the Master Register provisions, Article 2, to new [co-operatives]. On the other hand, Article 3, which regulates transfers of coop units, was intended by the author to apply to all transfers, including transfers of coop units which pre-existed the act. Nevertheless, the act, as adopted, indicates that the Legislature may have intended that Article 3 be limited to transfer of coops created after the act. This issues is currently awaiting decision in a pending action and is also the subject of proposed legislation. [*Meisel, supra,* at 1130–1131 (footnotes omitted).]

■ Clearly, the provisions of the Act have been made applicable only to post-Act cooperatives. Both the plain meaning of section 20, its placement within the Act, and the fact that a proposed amendment to section 20 was deemed necessary evidence such a legislative intent. *See supra* note 1.

We conclude, however, that it was not unreasonable for the legislature to distinguish between existing cooperatives and those created after the effective date of the Act. The temporal distinction can be perceived as related to legislative recognition of the difficulty of achieving a reliable system of public recording. After May 7, 1988, chains of title and other relevant information will be recorded accurately. Attempts to reconstruct chains of title for older existing cooperatives could tend to undermine public confidence in the accuracy and completeness of the recording scheme, as well as to create unwanted administrative difficulties. The Legislature need not take an all-or-nothing approach when rectifying a perceived evil. *Id.* 86 *N.J.* at 324. It can also decide that to start somewhere is better than to start nowhere.

We would conclude that the Act passes constitutional muster as to equal protection, but for that portion of the transfer tax applicable to post-Act cooperative transfers which is designated

as a source of revenue.[3] *See N.J.S.A.* 46:8D–2; 46:15–5 *et seq.*

While the Legislature may constitutionally differentiate between pre and post-Act cooperatives in many respects, including recording requirements, we can discern no rational basis in the present record for imposing only upon new cooperatives that portion of the real estate transfer tax imposed solely for revenue, as distinct from reflecting the cost of maintaining public recording facilities. *See, e.g., Baldwin Const. Co. v. Essex County Bd. of Taxation,* 16 *N.J.* 329, 343 (1954). The record before us, moreover, does not disclose what portion of the tax reflects such administrative costs associated with the Act and what portion is related solely to new revenue.

The judgment below is affirmed in all respects, except to the extent that it declares constitutional the imposition of a revenue-raising tax only upon post-May 7, 1988 cooperatives. We hold that only the cost burden connected with recording and administration may properly be assessed against such class by taxation. The matter is accordingly remanded solely for the purpose of making a record and findings sufficient to determine within a degree of constitutional exactness [4] the amount of tax attributable to that purpose. The tax may be enforced only to the extent found so attributable.

Affirmed in part, and reversed and remanded in part for further proceedings in accordance with this opinion. We do not retain jurisdiction.

---

[3]Although section 13 of the Act, the provision regarding the realty transfer tax, was understandably placed in *N.J.S.A.* 46:15–5, and does not explicitly distinguish between pre and post-Act cooperatives, such a differential is implicit as L.1987, c 381 only applies to cooperatives created after May 7, 1988.

[4]For equal protection purposes, mathematical precision is not required. *See In re Appeals of Kents 2124 Atlantic Ave., Inc.,* 34 *N.J.* 21 (1961); *Baldwin,* 16 *N.J.* 329 (1954).