584 A.2d 807

DREW ASSOCIATES OF NJ, LP, A NEW JERSEY LIMITED PART-
NERSHIP, PLAINTIFF–RESPONDENT AND CROSS–APPEL-
LANT, v. RANIERO TRAVISANO, CLERK OF MIDDLESEX
COUNTY, DEFENDANT, AND STATE OF NEW JERSEY, DE-
PARTMENT OF COMMUNITY AFFAIRS, DEFENDANT–AP-
PELLANT AND CROSS–RESPONDENT.

Argued October 10, 1990—Decided January 31, 1991.

250

*Daniel P. Reynolds,* Deputy Attorney General, argued the cause for appellant and cross-respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Mary C. Jacobson,* Deputy Attorney General, of counsel).

*Gage Andretta* argued the cause for respondent and cross-appellant (*Wolff & Samson,* attorneys; *Gage Andretta* and *Bruce Dickstein,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the constitutionality of the Cooperative Recording Act, a legislative determination to phase in a title-registration system for recording and taxing the creation and transfer of ownership in cooperative housing units. *N.J.S.A.* 46:8D-1 to -18. The Act applies only to cooperatives created after the effective date of the 1988 legislation. Previously formed units are exempt. In addition to enacting usual recording provisions, the Legislature amended the definition of

"deed" under *N.J.S.A.* 46:15–5 to include proprietary leases of cooperative units, thereby making the realty transfer tax applicable to transfers of ownership of cooperatives. The Appellate Division upheld the recording requirements but invalidated the transfer tax. We uphold both.

## I

Cooperative apartment ownership is a familiar type of housing ownership. For convenience, and without endorsing any of its particulars, we adopt the description given in American Jurisprudence. 15A *Am.Jur.*2d *Condominiums and Cooperative Apartments* §§ 1, 4, 62, and 71 (1976). The formation of a cooperative commonly begins with a cooperative sponsor who owns a building or is planning to buy or construct a building. The sponsor creates a cooperative entity. That cooperative entity is usually, though not always, organized in the form of a corporation. The cooperative corporation purchases the property from the sponsor and then issues stock with a "total par value equal to the purchase price." 15A *Am.Jur.*2d § 62 at 893. The stock is "allocated among the various apartments according to their estimated relative value." *Ibid.* Ordinarily, individual housing units are acquired by purchasing shares in the cooperative corporation. Stock purchasers are then given an exclusive right, usually in the form of a proprietary lease, to occupy one of the cooperative apartments. While the cooperative corporation is the titleholder to the property, the stock purchasers become "tenant-shareholders." The tenant-shareholders do not pay individual tax bills to the municipality, nor do they make individual mortgage payments. Rather, they pay to the cooperative corporation a monthly "carrying" charge, which represents their proportional share of the mortgage payment, common expenses, and tax payments assessed against the cooperative as a whole. In this way, tenant-shareholders are dependent on each other; if one fails to make a payment, the others must make up the difference.

Another form of housing ownership that is often compared to the cooperative is the condominium. Conceptually, the condominium-unit owner holds title to the individual condominium unit and has an undivided interest in the common facilities of the condominium building. As titleholders, condominium-unit owners are responsible for the mortgage payments and taxes on their own unit. Condominium-unit owners are not as dependent on each other as are cooperative tenant-shareholders.

Notwithstanding the differences in form, the Legislature has chosen to treat cooperative-housing interests as it treats other forms of real estate ownership in many circumstances. For example, cooperative-housing units are subject to the Retirement Community Full Disclosure Act. *N.J.S.A.* 45:22A–2. Under the Senior Citizens and Disabled Protected Tenancy Act, tenants in units converting to cooperatives have the same protections as tenants in units converting to condominiums or other forms of ownership. *N.J.S.A.* 2A:18–61.23.

## II

In 1988, the Legislature determined to treat the creation and transfer of an interest in cooperative-housing units in much the same manner as any other interest in real estate—more particularly, as it treats the creation and transfer of interests in condominium property. In the Cooperative Recording Act, the Legislature modified and extended the usual provisions of our recording-act system to cover cooperatives. Previously, the creation and transfer of the cooperative units did not have to be recorded in a place of public record.[1]

To create a housing cooperative now, the cooperative sponsor must record in the appropriate county recording office a master

---

[1] An amendment to the Act has been proposed and has been introduced to the Legislature as Senate Bill No. 1060 (1990). The amendment would extend the Act to those pre-Act cooperatives whose governing corporation elects to file a master register and master declaration executed in accordance with the Act.

declaration and a master register. *N.J.S.A.* 46:8D–5. The master declaration must contain a legal description of the property including scaled architectural plans; the corporate bylaws; a statement regarding the financing of the building; a schedule of the owners' shares of common expenses and common surplus; information on any restrictions or limitations on the use, transfer, or leasing of any unit; and information on voting procedures and on procedures to amend the master declaration. *N.J.S.A.* 46:8D–6. The master register must include an identification of each unit, the percent of common ownership representing each owner's proportionate undivided interest in the common elements, and the name and address of the present owner and occupant of each unit. *N.J.S.A.* 46:8D–7. All transfers of cooperative interests must now be recorded in order to be valid. *N.J.S.A.* 46:8D–11.

Drew Associates (Drew) is a limited partnership that, at the time of the appeal, was in the process of converting a multi-unit apartment building into a cooperative. Drew challenges the constitutionality of the Act on the basis that it is "so arbitrary, irrational and vague" that it violates Drew's due-process rights. Drew also contends that by exempting cooperative units created before the effective date of the legislation, the Act infringes on its equal-protection rights. Finally, Drew argues that the Act impermissibly imposes a double tax on cooperatives and that it creates an illegal restraint on alienation.

In ruling on the State's cross-motion for summary judgment, the Chancery Division upheld the constitutionality of the Act in all respects. The court found that the Act did not violate either the equal-protection rights or the due-process rights of the plaintiff. It held that the Act did not impose a double tax and that it did not create an unreasonable restraint on alienation.

While upholding the Act in all other respects, the Appellate Division found that the Act violated Drew's equal-protection rights in its application of the realty transfer tax. 235 *N.J.Super.* 194, 561 *A.*2d 1177 (1989). Unlike the Chancery Division,

the Appellate Division found no rational basis for imposing the tax only on transfers of cooperatives created after the effective date of the Act and not on transfers of cooperatives created before that date. The court ordered a remand to determine what portion of the tax represented administrative costs and what portion represented new revenue.

We granted both parties' petitions for certification. 118 *N.J.* 228, 570 *A.*2d 980 (1989); 118 *N.J.* 229, 570 *A.*2d 981 (1989).

## III

The Challenge to the Recording Aspects of the Statute.

Drew attacks the Cooperative Recording Act on both equal-protection and due-process grounds. Drew argues that the Act treats similarly situated entities differently and that the distinction does not reasonably relate to a legitimate state purpose. Thus, according to Drew, the Act contravenes the fifth and fourteenth amendments to the United States Constitution.

Federal equal-protection analysis employs different tiers of review: strict scrutiny when an act involves a fundamental right or a suspect class; intermediate scrutiny when an act involves a semi-suspect class; and minimal rational-basis scrutiny in all other cases. *Brown v. City of Newark,* 113 *N.J.* 565, 573, 552 *A.*2d 125 (1989). The Cooperative Recording Act does not involve a suspect or semi-suspect class, nor does it affect a fundamental right. Thus, it "need be only rationally related to a legitimate state interest to satisfy federal equal protection requirements." *Ibid.* This rational-basis standard is the functional equivalent of the due-process requirements of the fifth and fourteenth amendments. Under due-process analysis, a statute will survive a challenge if it is supported by a "conceivable rational basis." *Greenberg v. Kimmelman,* 99 *N.J.* 552, 563, 494 *A.*2d 294 (1985). While the equal-protection and due-process clauses "protect against different evils," analyses under those clauses, "while proceeding along parallel lines,

may overlap." *Id.* at 562 and 569, 494 *A.*2d 294. *See, e.g., Katobimar Realty Co. v. Webster,* 20 *N.J.* 114, 123, 118 *A.*2d 824 (1955) (due process and equal protection demand that exercise of police power be devoid of unreasonableness and arbitrariness and that means selected for fulfillment of policy bear a "real and substantial relation" to that end); *see also Holman v. Hilton,* 542 *F.Supp.* 913, 920 (D.N.J.1982) (for purposes of both equal-protection and due-process considerations, statute must be reviewed under "rational basis" and will be upheld only if it classifies affected persons in a manner "rationally related" to legitimate governmental objectives), *aff'd,* 712 *F.*2d 854 (3d Cir.1983). Although plaintiff's brief does not refer to state constitutional doctrine, our principles of state constitutional analysis in the area are substantially the same. *Brown v. City of Newark, supra,* 113 *N.J.* at 574, 552 *A.*2d 125.

Drew contends that the Act fails to meet the rational-basis standard in light of its stated purposes. Drew first attacks the cooperative recording system as being a completely unnecessary duplication of existing notice mechanisms. It argues that any prudent purchaser of shares in a cooperative would confirm the seller's ownership "by a simple review of the cooperative corporation's stock ledger and could easily determine whether a security interest has attached to those shares by searching 'UCC filings.'" In that review, a prospective purchaser could easily determine the overall financial condition of the cooperative, including the extent of any outstanding blanket mortgage. No further investigation would be required because no judgment, tax or municipal lien, easement, or right could be attached to the cooperative share, as its "essence" is its "personalty." Drew emphasizes that the Act creates uncertainty by arguably permitting the recording of a lender's lien against both the deed of the cooperative corporation and the tenant-shareholder's unit interest, giving rise to competing first mortgages. And by limiting the types of liens that may be recorded, the Act adds further uncertainty. Because these recording requirements fail to provide any additional protec-

tions to the public and serve only to add confusion, Drew contends that the Act "bear[s] no connection to the end purportedly being served."

Viewed in their best lights, these arguments go only to the wisdom of the legislation. In enacting the Cooperative Recording Act, the Legislature made certain findings that explain exactly why a rational basis exists to require the recording of the creation and transfer of cooperative interests, even though other available methods might achieve the same ends. Those findings are as follows:

> The Legislature finds that issuance of proprietary real estate leases by cooperative corporations and other cooperative legal entities is becoming a popular practice in New Jersey which is usually accomplished by a ledger book transfer to the lessee of stock or another indicia of ownership of an interest in the cooperative corporation or other cooperative entity which owns the real estate and that *there is no public record of the transaction.* The Legislature further finds that this is a hybrid transaction which is not capable of classification entirely as realty or personalty but that the public perception of a cooperative unit is that it in some manner involves real estate; that members of the public seek protection in cooperative leasing transactions *similar to those protections available in transactions for the purchase of real estate,* namely, a public title record, title searches to guarantee security of title, freedom from easements or rights in unknown third parties, unpaid liens, unsatisfied judgments, unpaid taxes, freedom from municipal violations, title insurance and the equivalent of a mortgage where a cooperative unit is the asset to be pledged as security for the purchase loan. The Legislature declares that enabling legislation in the form of a cooperative recording act is desirable because it would provide a title registration system for cooperative units and would provide additional revenue to county recording offices and to the State of New Jersey by applying the Realty Transfer Tax to proprietary leases issued by cooperatives and assignments thereof which are not presently covered by that tax.
>
> [*N.J.S.A.* 46:8D–2 (emphasis added).]

Thus, the Legislature envisioned the Act as a rational response to a perceived need of cooperative purchasers to have protections similar to those available in transactions for the purchase of real estate. Whether that measure is entirely necessary is simply a matter of legislative judgment. Hence, the fact that other sources of information are available does not warrant the conclusion that the recording requirements of the Act are arbitrary and unnecessary.

■ Contrary to Drew's assertions, the Act in no sense gives rise to competing first mortgages. All that is required under the Act is that the master register of the cooperative reflect the actual status of the title, including any liens thereon. *N.J.S.A.* 46:8D–14. The ownership interests that are the subject of the record are only the interests held by the individuals to whom the lender has advanced funds, not the interest in property of the cooperative corporation itself.

■ Drew also argues that the Act is unclear concerning the consequences of a decision to terminate the cooperative under the Act. In contrast, the "Condominium Act" provides that, on the termination of a condominium association, the individual unit owners become tenants-in-common. *N.J.S.A.* 46:8B–27. As the Attorney General points out, any confusion that may arise from the termination of a cooperative form of ownership stems not from the Act but rather from the nature of cooperatives themselves. An act that seeks only to improve and clarify the rights of cooperative tenant-shareholders should not be deemed unconstitutional because other complexities involved in terminating a cooperative have not been fully solved.

■ A somewhat more difficult point is the decision by the Legislature to phase in these recording requirements by imposing them only on cooperatives created after the effective date of the Act and not on preexisting cooperatives. The requirements imposed by the Act are substantial. In order to effectuate a recording under the Act, it is necessary to file a "master declaration" with scaled architectural plans, which can be extremely costly to prepare. *N.J.S.A.* 46:8D–6. This expense may be especially burdensome in the case of preexisting buildings that are now being converted into cooperatives, such as that owned by Drew. Drew points out that that burden is imposed despite the extensive identification and description of the building already required by *N.J.S.A.* 45:22A–21 to –42 ("Planned Real Estate Development Full Disclosure Act"). In addition, cooperative sponsors are now required to place on

record and maintain a "master register" of cooperative unit owners, which acts as a "chain of title" to the units. *N.J.S.A.* 46:8D–7.

We do not agree with Drew that the Legislature was unable to take any action at all, because valid distinctions arise under the Act between pre-Act and post-Act cooperatives. As the Appellate Division correctly pointed out, an attempt to reconstruct chains of title in the case of older existing cooperatives "could tend to undermine public confidence in the accuracy and completeness of the recording scheme, as well as to create unwanted administrative difficulties." 235 *N.J.Super.* at 210, 561 *A.*2d 1177. Additional difficulties are posed by having to recreate scaled drawings of pre-Act cooperatives, by locating the proper parties of the cooperative for the purposes of the master declaration, and by gaining the cooperation of existing lienholders who may not have prepared the financial documents in accordance with the Act. In the face of those circumstances, the Appellate Division correctly concluded that remedial legislation need not be "all-or-nothing" and that the Legislature can decide that to start somewhere is better than to start nowhere. *Ibid.*

Finally, Drew argues that the Act creates an unconstitutional restraint on alienation in that it establishes the recording of a "transfer document" as an absolute prerequisite to the sale or transfer of cooperative shares. To be in recordable form, the "transfer document" must contain an "executed and acknowledged consent of the cooperative board of managers authorizing and approving the transfer or assignment." *N.J. S.A.* 46:8D–11(g). However, the Act does not impose any standards on the cooperative's board of managers in deciding whether to approve the sale. Thus, Drew concludes that, rather than facilitating the free and orderly transfer of the interests in accordance with its stated purposes, the Act restrains cooperative transfers by adding restrictions not placed

on any other real estate transaction, including condominium transactions.

As the Legislature itself has pointed out, cooperative ownership constitutes a "hybrid" form of property that does not readily fall within the traditional notions of either realty or personalty. Thus, it is reasonable that the Legislature would choose to treat the transfer of cooperative interests differently from the transfer of other real estate interests. Any conditions on the transfer of cooperative interests must be clearly set forth in the documents recorded with the County Clerk at the time of the creation of the plan of cooperative ownership. *N.J.S.A.* 46:8D–6(*l*). Those conditions obviously must be consistent with, and not violative of, any applicable rules of law. *Ibid.* As the Attorney General points out, the possibility that a private party, such as a cooperative board of managers, might exceed its statutory authority by unreasonably withholding its consent to the transfer of a cooperative unit does not render arbitrary and invalid a statute that authorizes the party to limit transferability in accordance with reasonable standards. The Legislature did not intend to grant any right to the board of managers to refuse to consent to transfer. It merely recognized that most cooperatives have some requirement of consent. Therefore, in order to make recordation more meaningful, it required recognition of that consent.

## IV

### The Challenge to the Taxation of Post–Act Transfers.

Thus far we have been in agreement with the Appellate Division with respect to the constitutionality of the Cooperative Recording Act. We depart from the Appellate Division's conclusions, however, with respect to the constitutionality of the realty transfer tax imposed under the Act. The Appellate Division concluded that there was no rational basis for distinguishing between pre-Act and post-Act cooperatives with re-

spect to the transfer tax. We disagree and begin by restating the applicable principles of equal-protection analysis:

> In the field of taxation states are given "large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation." *Lehnhausen v. Lakeshore Auto Parts Co.*, 410 *U.S.* 356, 359, 93 *S.Ct.* 1001, 1003, 35 *L.Ed.*2d 351 (1973). Indeed, a strong presumption of constitutionality attends the legislative classification and the party challenging it must negate "every conceivable" basis for the statute, since the statute must be upheld if any state of facts can be reasonably conceived to sustain it.
>
> [*Mueller Estate v. Transfer Inheritance Tax Bureau*, 5 *N.J. Tax* 642, 650–51 (Tax Ct.1983) (other citations omitted).]

Absent the presence of an invidious discrimination or suspect classification that would raise the standard of review, all that the Constitution requires is that the statute be rationally related to the achievement of a legitimate state objective. *Barone v. Department of Human Servs.*, 107 *N.J.* 355, 365, 526 *A.*2d 1055 (1987) (citing *Dandridge v. Williams*, 397 *U.S.* 471, 90 *S.Ct.* 1153, 25 *L.Ed.*2d 491 (1970)). Under the rational-basis standard the scope of review of legislative classification is extremely limited. In *New Jersey Restaurant Association, Inc. v. Holderman*, 24 *N.J.* 295, 300, 131 *A.*2d 773 (1957), this Court said:

> The burden of demonstrating that a statute contravenes the equal protection clause is extremely formidable, as is attested by the long trail of failure. In addition to the strong presumption of constitutionality with which all organic challenges are approached, one who assails a statute on this ground must contend with principles of unusual elasticity. It is easily stated that the classification (1) must not be palpably arbitrary or capricious, and (2) must have a rational basis in relation to the specific objective of the legislation. But the second proposition is qualified by limitations which compound the difficulties of one who assails the legislative decision. Thus it is not enough to demonstrate that the legislative objective might be more fully achieved by another, more expansive classification, for the Legislature may recognize degrees of harm and hit the evil where it is most felt. (citations omitted). The Legislature may thus limit its action upon a decision to proceed cautiously, step by step, or because of practical exigencies, including administrative convenience and expense, (citations omitted) or because of "some substantial consideration of public policy or convenience or the service of the general welfare." *De Monaco v. Renton*, 18 *N.J.* 352, 360 [113 *A.*2d 782] (1955). Hence, it may "stop short of those cases in which the harm to the few concerned is thought less important than the harm to the public that would ensue if the rule laid down were made mathematically exact." *Dominion Hotel, Inc. v. State of Arizona, supra,* (249 *U.S.* [265] at *page* 268, 39 *S.Ct.* [273] at *page* 274 [63 *L.Ed.* 597 (1919)]).

We have recently restated those same principles in the context of differentiated tax treatment afforded to counties based on population statistics within the counties. *Township of Mahwah v. Bergen County Bd. of Taxation,* 98 *N.J.* 268, 486 *A.*2d 818, *cert. denied sub nom. Borough of Demarest v. Mahwah Township,* 471 *U.S.* 1136, 105 *S.Ct.* 2677, 86 *L.Ed.*2d 696 (1985). Although there were many logical arguments in favor of equal application of the legislative scheme to all counties regardless of population, the Court nonetheless concluded:

> [W]here the question of reasonableness is fairly debatable, courts will uphold the classification. The burden of showing that the classification is not reasonable is upon the party attacking the statute. If we can conceive of any reason to justify the classification, the statute will be upheld.
>
> [*Id.* at 290, 486 *A.*2d 818 (quoting *Newark Superior Officers Ass'n v. City of Newark,* 98 *N.J.* 212, 227, 486 *A.*2d 305 (1985)).]

Given this high threshold that a challenge to a tax classification must meet, we are simply unable to say that considerations of "administrative convenience and expense" in adapting the program to pre-Act cooperatives would not justify this "step by step" approach to the regulation of taxation of housing cooperatives.

As has been noted, the Appellate Division concluded that the administrative difficulties attendant on the establishment of a reliable recording system for pre-Act cooperatives and the understandable inconvenience to pre-Act cooperative owners that would be engendered by the retroactive effects of the law warranted the Legislature's conclusion that only transfers of cooperatives created in accordance with the Act should be subject to its requirements. Given that distinction, administrative difficulties would inevitably arise in attempting to impose the realty transfer tax on the transfer of cooperatives not subject to the Act. As the Attorney General's petition points out:

> No system exists for the recording of such transfers. In fact, no requirement exists that such transfers even be recorded. As a consequence, the county clerks responsible for collecting realty transfer fees would have no practical means of assessing and collecting realty transfer fees upon the transfer of such cooperatives.

In addition to the matters of administrative convenience that could rationally justify this form of differential tax treatment, post-Act cooperatives are genuinely different from pre-Act cooperatives due to the benefits they receive from the Act. These distinguishing benefits, which are set forth in the Appellate Division opinion, are real and significant. They include security of the title against the claims of predecessors; security that the unit has not been pledged for a loan or attached by execution or levy; security that there are no unpaid taxes or municipal violations; an effective method of municipal assessment; the elimination of title gaps on the resale of cooperative units, making it possible to obtain title insurance; greater availability of purchase money loans because of the increased security of the cooperative title; and greater availability of information about the cooperative.

Two cooperative buildings, one organized a month before the effective date of the Act and the other a month after the effective date, standing side-by-side, may appear from the outside to be identical. But, they are not; the Act makes them different. The ownership interest that is transferred under the new Act is "not identical" with one transferred before the Act. When transactions are different, a different tax may be imposed. *Cf. Alaska v. Arctic Maid,* 366 *U.S.* 199, 205, 81 *S.Ct.* 929, 932, 6 *L.Ed.*2d 227, 231 (1961) ("No 'iron rule of equality' between taxes laid by a State on different types of business is necessary" under commerce-clause analysis).

Because, then, these rational bases for distinguishing between transfers of pre- and post-Act cooperative shares exist, the Legislature's determination to subject the transfers of cooperative units created pursuant to the Cooperative Recording Act of 1982 to the realty transfer tax does not offend equal-protection requirements.

Drew makes a final challenge to the taxation of transfers of interest in post-Act cooperatives, arguing that it constitutes a form of double taxation. Drew envisions the

situation in which the cooperative corporation's purchase of the underlying real estate and the transfer of shares to each individual unit holder occurs "practically simultaneous[ly]". According to Drew, the cooperative corporation acquires title to the underlying real estate for no purpose other than to divide immediately the interest in the cooperative among the tenant-shareholders. Drew contends that this "unitary transaction" is subject to a prohibitive double tax because both events, the corporation's acquisition of the real estate and the distribution of shares to the tenant-shareholders, are subject to the realty transfer tax. Drew also argues that because only post-Act cooperatives are subject to the double tax while condominium owners and pre-Act cooperatives are not, post-Act cooperatives are unconstitutionally discriminated against. Further, Drew questions the State's method of assessing consideration under which the realty transfer tax is imposed on post-Act coopera-tives. For post-Act cooperatives, consideration is equal to "the total price paid for the ownership interest held in conjunction with a cooperative unit, including the pro rata amount of any underlying mortgage or other obligation of the cooperative." *N.J.S.A.* 46:15–5(c). Drew contends that this method simply "makes no sense" because the tenant-shareholders are not individually responsible for the blanket mortgage and that the calculations involved are so complex that it would be "virtually impossible" to determine the amount of the tax.

Without attempting to validate the intricacies of cooperative conversions or cooperative marketing, it does appear to us that there is at least a rational basis for the legislative regime for taxing cooperative transfers. That, in some cases, it may be more costly to use the cooperative plan of ownership does not make it unconstitutional. The fact that one property owner chooses to use the cooperative plan of ownership, while another chooses to use the condominium plan of ownership does consti-tute a difference in the two forms of ownership that warrants different treatment for the purposes of the imposition of the realty transfer tax. And on the question of the inclusion of

mortgage amounts in determining sale price, the tax appears to reflect the reality that the tenant-shareholders will be paying a share of the mortgage through their monthly carrying charge. It would appear that any "double taxation" is a result of the marketing choice or marketing opportunity. If the reality is that cooperative interests are transfers in separate transactions, there is no double taxation because, as the Appellate Division found, the transfer tax is imposed "pursuant to the Act upon separate owners on distinct transfers at different times." 235 *N.J.Super.* at 206, 561 *A.*2d 1177. If the reality is that cooperative interests are transferred in a "unitary" transaction, then it has been suggested that the "double tax" can be avoided. Flowers, "Recording of Co-ops: The New Requirements," 121 *N.J.L.J.* 640, 657 (1988). Again, we have no way of evaluating those development regimes, but they do suggest that there may be no intrinsic double taxation present.

The judgment of the Appellate Division is affirmed in part and reversed in part. The judgment of the Chancery Division upholding the imposition of the realty transfer tax on post-Act cooperatives is reinstated.

*For affirmance in part; reversal in part; and reinstatement*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.