251 N.J. Super. 541 (1991)
598 A.2d 1219
IN THE MATTER OF AMERICAN RELIANCE INSURANCE COMPANY; AMERICAN RELIANCE CASUALTY COMPANY; CUMBERLAND MUTUAL FIRE INSURANCE COMPANY; CUMBERLAND INSURANCE COMPANY, INC.; FARMERS' MUTUAL FIRE ASSURANCE ASSOCIATION OF NEW JERSEY; FARMERS' MUTUAL FIRE INSURANCE COMPANY OF SALEM COUNTY; SALEM INSURANCE COMPANY; FRANKLIN MUTUAL INSURANCE COMPANY; FMI INSURANCE COMPANY; MERCER MUTUAL INSURANCE COMPANY; AND MERCER INSURANCE COMPANY.
Superior Court of New Jersey, Appellate Division.
Argued September 17, 1991.
Decided October 24, 1991.
*544 Before Judges ANTELL, BAIME and THOMAS.
James J. Shrager argued the cause for appellants (Hannoch Weisman, attorneys; James J. Shrager of counsel; James J. Shrager and Susan Stryker on the brief).
Joseph L. Yannotti, Deputy Attorney General, argued the cause for respondent Commissioner of Insurance (Robert J. Del Tufo, Attorney General, attorney; Mary C. Jacobson, Deputy Attorney General, of counsel; Joseph L. Yannotti and Carol Johnston, Deputy Attorney General, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Appellants are small, New Jersey domiciled property and casualty mutual insurance companies which do virtually all of their business in this State. With the exception of American Reliance Casualty Company, appellants are not authorized to write automobile insurance and none of them participated as servicing carriers for the New Jersey Full Insurance Underwriting Association (JUA). In this appeal, they challenge the facial constitutionality of the Fair Automobile Insurance Reform Act of 1990 (FAIR Act) (N.J.S.A. 17:33B-1 to -63), contending that the statutory scheme violates their right to equal protection and due process, effects a confiscatory taking of their property, and impermissibly impairs existing contractual rights and obligations. Appellants also assert that the Commissioner of Insurance violated the Administrative Procedure Act (N.J.S.A. 52:14B-1 to -15) by promulgating agency rules without *545 adhering to statutory requirements. We find no merit in the contentions advanced.

I.
A brief description of the evolution of automobile insurance regulation in New Jersey is necessary for a complete understanding of the issues presented. A far more extensive exposition of this history appears in our Supreme Court's recent opinion in State Farm v. State, 124 N.J. 32, 590 A.2d 191 (1991). We need not retread upon ground so exhaustively covered there except as it relates to the arguments advanced by appellants in this appeal.
For many years, New Jersey has endeavored to provide motorists with an "equitable, efficient and economical" program to indemnify owners and operators for injuries and damages sustained in their operation. N.J.S.A. 17:33B-2b. One of the more intractable problems has been the difficulty of providing coverage for high-risk drivers. Prior efforts to combat this problem have not been successful. In 1983, for example, the Legislature determined that the Assigned Risk Plan (N.J.S.A. 17:29D-1), under which the Commissioner apportioned high-risk drivers among all automobile insurers doing business in New Jersey, was not economical or efficient. Under the Automobile Full Insurance Availability Act (N.J.S.A. 17:30E-1 to -24), the assigned risk system was abandoned and replaced by the JUA. The objective of the new scheme "was to create a more extensive system of allocating high-risk drivers to carriers, and through the JUA, to provide such [individuals] with coverage at rates equivalent to those charged in the voluntary market." State Farm v. State, 124 N.J. at 32, 590 A.2d 191. Unfortunately, the JUA plan did not achieve its objectives. Among other failures, the JUA accumulated a deficit of over $3.3 billion in unpaid claims and other losses.
The FAIR Act is the Legislature's most recent effort to resolve these problems. We have no occasion to describe the *546 newly adopted procedures designed to "depopulate" the JUA and provide economical coverage to "standard" and "non-standard" risk drivers. We are concerned here with the FAIR Act's provisions designed to create a funding mechanism to pay off the JUA's debt. The FAIR Act created the New Jersey Automobile Insurance Guaranty Fund (Auto Fund) to collect and disburse various payments to relieve the JUA deficit. N.J.S.A. 17:33B-5. Certain types of income which formerly went to the JUA are assigned to the Auto Fund. Ibid. In addition, new sources of funding were created, including revenues attributable to a surtax upon automobile insurance premiums, N.J.S.A. 17:33B-49, fees on lawyers, doctors, and auto body repair businesses, N.J.S.A. 17:33B-58 to -63, and most significant in the context of this appeal, the imposition of assessments on many types of insurers, N.J.S.A. 17:30A-8a(9) and -8a(10).
The assessments imposed on insurance carriers are collected through the Property Liability Insurance Guaranty Association (PLIGA). N.J.S.A. 17:30A-8a(8). These assessments are measured by the proportion that the net direct written New Jersey premiums of the insurer for the preceding calendar year bear to the net direct written New Jersey premiums of all PLIGA members. PLIGA was initially created in 1974 to impose assessments on New Jersey property-casualty insurers to pay claims against carriers that had become insolvent (N.J.S.A. 17:30A-1 to -20), but under the FAIR Act it has the additional duty of imposing and collecting the newly created assessments on its members. These additional assessments are to be applied exclusively to the JUA debt. The FAIR Act denominates these assessments as "loans" and requires that they be paid into the Auto Fund. N.J.S.A. 17:30A-8a(10). We briefly digress to note that all PLIGA members are obliged to pay these assessments, whether or not they previously participated in the JUA system.
Several sections of the FAIR Act deal with the problem of attempts to recoup assessments and surcharges from policyholders. In the past, PLIGA members were generally permitted *547 to pass through insolvency assessments to their insured. Although originally these "pass throughs" took the form of rate increases, in 1979 the method was changed to direct surcharges on policy premiums. Surcharges for insolvency assessments are permitted by the FAIR Act. N.J.S.A. 17:30A-16a. However, the FAIR Act specifically prohibits dollar-for-dollar "pass throughs" of the newly created surtaxes and assessments. N.J.S.A. 17:30A-16b provides:
No member insurer shall impose a surcharge on the premiums of any policy to recoup assessments paid pursuant to [the provisions requiring assessments to be loaned to the Auto fund.]
Bolstering this prohibition is N.J.S.A. 17:33B-51, which states:
[t]he Commissioner of Insurance shall take such action as is necessary to ensure that private passenger automobile insurance policyholders shall not pay for the surtax imposed pursuant to [N.J.S.A. 17:33B-49].
In several sections, the FAIR Act empowers the Commissioner to exempt, abate or defer premium surcharges and PLIGA assessments. In particular, if an insurer is at risk because of an "unsafe or unsound financial condition," the Commissioner may suspend (1) its obligation to accept what would be its allocation of assigned risks, N.J.S.A. 17:33B-23 and -24, (2) its obligation to issue or renew automobile policies, N.J.S.A. 17:33B-27, and (3) its obligation to pay the premium surtax, N.J.S.A. 17:33B-52 and -53. Obviously, these statutory "safety valves" afford relief only to automobile insurers. However, in addition to these ameliorative sections, N.J.S.A. 17:33B-55 and -56 allow the Commissioner to suspend the obligation to pay PLIGA assessments. These latter sections apply to all insurers who are PLIGA members, not merely automobile insurers. Both with respect to surcharges and PLIGA assessments, separate sections either mandate abatement or deferment, N.J.S.A. 17:33B-52 and N.J.S.A. 17:33B-55, or confer substantial discretion on the Commissioner to take that course, N.J.S.A. 17:33B-53 and N.J.S.A. 17:33B-56, depending upon specific statutory criteria that must be satisfied. The point we stress at this posture is that, despite the seemingly mandatory nature of the assessments and surcharges imposed and the *548 prohibition against "pass throughs," the FAIR Act expressly recognizes exceptions to protect the financial viability of insurers.
This legislative recognition is best evidenced by N.J.S.A. 17:33B-2g, which provides that "automobile insurers are entitled to earn an adequate rate of return through the ratemaking process." This section was not part of the FAIR Act as initially drafted. State Farm v. State, 124 N.J. at 57, 590 A.2d 191. It was among the amendments introduced by the Assembly Appropriations Committee. The Legislature later adopted this amendment, while rejecting proposals designed to strengthen the sections prohibiting "pass throughs" of the premium surtaxes and PLIGA assessments. Ibid.

II.
We now turn to the procedural context in which appellants have mounted their constitutional challenge. On May 30, 1990, appellants filed a petition, seeking a declaration that they were not subject to the assessments imposed by N.J.S.A. 17:30A-8a(9). They contended that it would be unfair to require them to pay the assessments because they had never written automobile insurance and had never been servicing carriers of the JUA. Alternatively, appellants sought exemption or deferral of the assessments in the event the Commissioner determined that the FAIR Act applied to them.
On June 29, 1990, the Commission determined that assessments under the FAIR Act applied to all PLIGA members and was not confined to automobile insurers. In addition, the Commissioner denied appellants' requests for mandatory exemptions under N.J.S.A. 17:33B-55 because they failed to submit the documentation required by Orders A90-126 and A90-127. Those orders specify the types of information that must be submitted in support of a mandatory deferral or exemption application. Appellants' request for discretionary exemptions under N.J.S.A. 17:33B-56 were deferred pending further review. *549 On July 16, 1990, appellants submitted supplemental material in support of their requests for discretionary exemptions. Appellants later requested a hearing. While that request was pending, appellants filed a notice of appeal to this court.
On October 29, 1990, the Commissioner issued Order A90-198, which identified the types of information that must accompany a request for a discretionary exemption or deferral. Shortly thereafter, the Department advised appellants of this order and the need to submit further information. This information was not provided. Instead, appellants challenged the validity of the order, contending that production of the additional information would be unduly burdensome and costly.
The Commissioner then moved to dismiss appellants' appeal on jurisdictional grounds. On December 11, 1990, we denied the Commissioner's motion and granted appellants leave to appeal nunc pro tunc. We now affirm the Commissioner's decision that the FAIR Act may constitutionally be applied to all PLIGA members. We also uphold the informational requirements contained in the Commissioner's Order A90-198.

III.
Certain prefatory comments are necessary before reviewing appellants' arguments. At the outset, we emphasize the limited scope of our review. In addressing the constitutionality of legislation, it is not our function to evaluate its efficacy or wisdom. Hutton Pk. Gardens v. West Orange Town Council, 68 N.J. 543, 563, 350 A.2d 1 (1975). We do not sit as a "superlegislature." Burton, et al. v. Sills, 53 N.J. 86, 95, 248 A.2d 521 (1968). The "expediency" of a statute is for the lawmaking body alone. Lane Distributors, Inc. v. Tilton, 7 N.J. 349, 365, 81 A.2d 786 (1951). Moreover, legislative enactments "are presumed to be valid and the burden on the proponent of invalidity is a heavy one." Hutton Pk. Gardens v. West Orange Town Council, 68 N.J. at 564-65, 350 A.2d 1.
*550 These well-settled principles are particularly compelling in the context of a challenge to the facial constitutionality of legislation. In such cases, "the effects [of the statute] on particular participants in an industry are not dispositive; rather, the question is whether the `mere enactment' of a statute offends constitutional rights." State Farm v. State, 124 N.J. at 46, 590 A.2d 191. It has been said that "holdings of facial unconstitutionality are exceedingly rare." Ibid.
Although couched in constitutional verbiage, the essence of appellants' arguments is that they are more drastically affected by the financial burdens imposed by the FAIR Act because their business is confined to New Jersey and they are assessed on virtually all of their premiums. They claim that the impact of the assessments is significantly greater on them than on national insurers. Appellants also assert that even if they are ultimately allowed to pass through the assessments to their policyholders, they will be effectively precluded from offering competitive property and casualty rates.
We will consider these arguments shortly. At this point, we merely note that appellants have neither exhausted their administrative remedies, see Christian Brothers Institute v. Northern N.J. Interscholastic League, 86 N.J. 409, 416, 432 A.2d 26 (1981); City of Atlantic City v. Laezza, 80 N.J. 255, 265, 403 A.2d 465 (1979), nor provided a factual record substantiating their claims, see Abbott v. Burke, 100 N.J. 269, 299, 495 A.2d 376 (1985). Instead, we are left with dire predictions of financial calamity. We will not invalidate the FAIR Act on so slim a reed.

IV.
We first consider appellants' argument that the FAIR Act violates their right to equal protection and substantive due process. As we have noted, they contend that the FAIR Act is oppressive to insurers who derive most of their premium revenue from New Jersey. The assessments purportedly have a *551 significant adverse impact on appellants' ability to do business, while having little practical effect on insurers who operate nationwide. They also claim that imposition of the assessments on them is unfair because they derived no direct financial benefit from the JUA.
In addressing these contentions, we apply the "minimal rational basis" test, rather than the "strict scrutiny" or "intermediate scrutiny" standards which are used when a statute involves a "fundamental right or suspect class" or a "semi-suspect class." See Drew Associates of NJ, LP v. Travisano, 122 N.J. 249, 258, 552 A.2d 125 (1991); Brown v. City of Newark, 113 N.J. 565, 573, 552 A.2d 125 (1989). The FAIR Act does not involve a suspect or semi-suspect class, nor does it affect a fundamental right. Thus, it "need be only rationally related to a legitimate state interest to satisfy federal equal protection requirements." Brown v. City of Newark, 113 N.J. at 573, 552 A.2d 125. Where the question of reasonableness is fairly debatable, we will uphold the classification. Drew Associates of NJ, LP v. Travisano, 122 N.J. at 265, 584 A.2d 807; Township of Mahwah v. Bergen County Bd. of Taxation, 98 N.J. 268, 290, 486 A.2d 818 (1985), cert. denied sub nom.; Borough of Demarest v. Mahwah Township, 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985); Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212, 227, 486 A.2d 305 (1985).
The same level of scrutiny applies under the comparable provisions of the New Jersey Constitution. While the phrase "equal protection" does not appear in the State Constitution, our courts have held that the same protection is provided by our organic law. See Greenberg v. Kimmelman, 99 N.J. 552, 568, 494 A.2d 294 (1985). Specifically, Art. I, par. 1 of the New Jersey Constitution, "like the fourteenth amendment, seeks to protect against injustice and against the unequal treatment of those who should be treated alike." Ibid. In the context of the New Jersey Constitution, we consider the nature of the affected *552 right, the extent to which the governmental classification intrudes upon it, and the public need for the manner in which the legislation classifies comparable categories. Barone v. Dept. of Human Services, 107 N.J. 355, 368, 526 A.2d 1055 (1987). "Both [federal and state] tests consider the nature of the individual rights affected by the governmental action being challenged, the importance of the governmental interests being furthered, and the degree to which the challenged restriction is necessary to achieve those interests." Ibid.
This analytical framework also applies to substantive due process challenges. Although the equal protection and due process clauses "protect against different evils," analyses under those clauses, "while proceeding along parallel lines," may overlap. Drew Associates of NJ, LP v. Travisano, 122 N.J. at 258-59, 584 A.2d 807; see also Barone v. Dept. of Human Services, 107 N.J. at 368, 526 A.2d 1055. Both constitutional protections demand that legislation "be devoid of unreasonableness and arbitrariness," Drew Associates of NJ, LP v. Travisano, 122 N.J. at 259, 584 A.2d 807, and that the means selected to achieve the governmental objective bear a "real and substantial relation" to that end, Katobimar Realty Co. v. Webster, 20 N.J. 114, 123, 118 A.2d 824 (1955). If a statute does not affect a fundamental right and is supported by a conceivable rational basis, it will withstand a substantive due process challenge. Greenberg v. Kimmelman, 99 N.J. at 563, 494 A.2d 294; see also Ocean Pines, Ltd. v. Borough of Pt. Pleasant, 112 N.J. 1, 10, 547 A.2d 691 (1988); Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., 71 N.J. 249, 283 (1976), app. dismissed sub nom.; Feldman v. Weymouth Tp., 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1979). Due process claims under the federal and New Jersey constitutions are analyzed by utilizing essentially the same balancing test. Greenberg v. Kimmelman, 99 N.J. at 567, 494 A.2d 294. "[O]ur principles of state constitutional analysis in this area are substantially the same" as their federal counterparts. Drew Associates of NJ, LP v. Travisano, *553 122 N.J. at 259, 584 A.2d 807; see also Brown v. City of Newark, 113 N.J. at 574, 552 A.2d 125.
Applying these principles, we find that imposition of assessments upon all PLIGA members constitutes a reasonable method of achieving an appropriate governmental objective. As we have noted, the purpose of imposing assessments is to raise revenue to pay the accumulated debts and obligations of the JUA. Appellants do not contend, nor could they, that the objective sought to be achieved under the FAIR Act is inappropriate.
The pivotal question is whether the means chosen by the Legislature to accomplish this goal are unreasonable. The thrust of appellants' argument is that only automobile insurers should be obligated to pay the JUA debt. However, we are of the view that the Legislature could reasonably look to the broader category of property liability insurers as one source of the funds required to meet the JUA debts and obligations. Selection of that group for imposition of the assessments serves to distribute the financial burden among a wider circle of insurers.
The fact that some members of the burdened class did not directly benefit from the JUA system is not sufficient to render the classification arbitrary or unreasonable. N.J. State Bar Ass'n. v. Berman, 11 N.J. Tax 433, 447 (Tax Ct. 1991). The federal and State constitutions do not require a direct correlation between the burden of taxation and benefits derived from a particular program. It has been said, albeit in a slightly different context, that "[t]he only benefit to which [a] taxpayer is constitutionally entitled is that derived from his enjoyment of living in an organized society, established and safeguarded by the devotion of taxes to public purposes." Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 522, 57 S.Ct. 868, 878, 81 L.Ed. 1245, 1261 (1937). We do not suggest that an assessment can be imposed in an irrational manner. However, in the area of economic legislation, the Legislature does not *554 violate equal protection or due process "because the classifications made by its laws are imperfect." Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491, 501 (1970). Legislative classifications need not be made with "mathematical nicety." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369, 377 (1911). "The problems of government are practical ones and may justify, if they do not require, rough accommodations...." Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69-70, 33 S.Ct. 441, 443, 57 L.Ed. 730, 734 (1913). The simple and overriding fact is that all insurers benefit from a stable insurance market. Appellants cannot fairly resist payment of the assessments merely because they may not derive direct economic benefit from the manner in which they are to be used  to relieve the JUA deficit.
Imposition of assessments on members of PLIGA is consistent with the purpose for which that association was created. As we noted earlier, PLIGA was established to avoid financial loss to claimants or policyholders because of the insolvency of an insurer. It is authorized to assess its member insurers to meet the cost of such protection. N.J.S.A. 17:30A-2. It was thus reasonable for the Legislature to select PLIGA as a source of funding to relieve the JUA deficit.
We also reject appellants' contention that the FAIR Act is unconstitutionally infirm because it allegedly has a disparate impact on insurers who operate exclusively in New Jersey, when compared with its effect on insurers who engage in business in other states. Appellants point to the "negative" effect that the assessments have had on their ratings by A.M. Best Company. A.M. Best issued a letter which "qualified" its rating for insurers with significant underwriting exposure in New Jersey. We note, however, that this letter is somewhat equivocal in that A.M. Best conceded it could not evaluate the potential impact of the assessments upon a company's ongoing operations "as regards to its profitability, leverage and liquidity, including its ability to maintain policyholders' surplus at *555 prudent levels." The point is largely irrelevant in any case, because there is a rational basis for imposing assessments on all PLIGA members. Levying assessments based on the amount of premiums earned in New Jersey is a reasonable means of deriving revenues to pay the JUA debt.

V.
Appellants next contend that the imposition of assessments on all PLIGA members effects an unconstitutional taking of private property without just compensation. This argument does not require extended discussion. In State Farm v. State, our Supreme Court rejected a similar contention advanced by a group of automobile insurers. 124 N.J. at 61, 590 A.2d 191. From its examination of the statutory scheme, the Court found an "overall intent [on the part of the Legislature] to make certain that any lessening of insurers' profits due to the surtaxes and assessments would not preclude a constitutionally adequate rate of return." Ibid. The Court said that although N.J.S.A. 17:30A-16b and N.J.S.A. 17:33B-24 bar consideration of surtaxes and assessments in ordinary ratemaking, they did not preclude the Commissioner from permitting insurers a rate adjustment if necessary to assure a constitutionally adequate return. Ibid. The Court's holding applies with equal force here.
We recognize that several of the FAIR Act's provisions designed to assure that insurers receive a fair return are confined to automobile insurers. For example, several of the remedies to protect an insurer at risk because of its "unsafe or unsound financial condition" do not apply to property and casualty insurers such as appellants. As we pointed out previously, the Commissioner may suspend an insurer's obligation to accept its allocation of risks under an Assigned Risk Plan, its obligation to issue or renew automobile policies, and its obligation to pay the premiums surtax. These remedies are applicable only to automobile insurers.
*556 Also troubling is the wording of N.J.S.A. 17:33B-2g, which states that "automobile insurers are entitled to an adequate rate of return through the ratemaking process." (Emphasis added). Read literally, this guarantee applies only to automobile insurers.
Despite these differences, we find legislative recognition of the State's overarching constitutional obligation to assure all insurers a reasonable rate of return. The legislative pronouncement that "automobile insurers are entitled to earn an adequate rate of return through the ratemaking process," N.J.S.A. 17:33B-2g, does not manifest an intent to preclude other property and casualty insurers from securing rate relief if necessary. It must be remembered that the focus of the FAIR Act was the comprehensive revision of New Jersey's automobile insurance system. The Legislature's explicit reference to "automobile insurers" in N.J.S.A. 17:33B-2g is thus understandable.
To clarify the point, the Commissioner has issued Order No. A91-288, which sets forth the procedure by which insurers (other than automobile insurers) may increase their rates based on the FAIR Act assessments. This order, which will be in effect pending its formal adoption as an administrative regulation, expressly authorizes consideration of the economic effect of the FAIR Act assessments in addressing an insurer's claim that it is being deprived of a constitutionally adequate return. The administrative understanding reflected by the order is "persuasive evidence of the intent of the Legislature in enacting the regulatory scheme." State Farm v. State, 124 N.J. at 58, 590 A.2d 191; see also Smith v. Director, Div. of Taxation, 108 N.J. 19, 25-26, 527 A.2d 843 (1987); Malone v. Fender, 80 N.J. 129, 134, 402 A.2d 240 (1979).
We thus hold that the FAIR Act does not, on its face, impose a confiscatory taking with respect to property and casualty insurers.

*557 VI.
We find no merit in appellants' arguments that the FAIR Act impermissibly impairs their contractual rights and obligations. In support of their contention, appellants cite N.J.S.A. 17:30E-7(e), which provides that "[s]ervicing carriers, as agents of the [JUA], shall have no individual liability for claims or policies...." They also point to N.J.S.A. 17:30A-16, which prior to its amendment by the FAIR Act, read "[t]he commissioner shall adopt rules permitting member insurers to recoup over a reasonable length of time, a sum reasonably calculated to recoup assessments ... by way of surcharge on the premiums charged for insurance policies...."
These statutes did not create contract rights. Thus, "[t]here was [no] contractual relationship for the [FAIR] Act to impair." State Farm v. State, 124 N.J. at 64, 590 A.2d 191. Like all other statutes, N.J.S.A. 17:30E-7(e) and N.J.S.A. 17:30A-16 were "potentially transient, subject to change by the Legislature that ... created them." Ibid. Even if there were an impairment of a contractual relationship, however, "it would nonetheless be justified in this instance because the [FAIR] Act addresses a significant and legitimate public purpose, imposing reasonable conditions that are related to appropriate governmental objectives." Id. at 65, 590 A.2d 191; see also Energy Reserves Group, Inc. v. The Kansas Power & Light Co., 459 U.S. 400, 411, 103 S.Ct. 697, 704-05, 74 L.Ed.2d 569, 580-81 (1983).

VI.
Appellants' attack upon Order 90-198 is beyond the scope of this appeal. The Order specifies the filing requirements for insurers seeking exemption or deferral of their payment of assessments. This Order was issued on October 29, 1990, approximately two months after appellants filed their appeal in this case. It is thus beyond the scope of this appeal.
*558 In any event, we find nothing unreasonable in the requirements of the Order. All of the informational requirements pertain to the safety and soundness of an insurer's financial condition.
Nor did the Department violate the Administrative Procedure Act in issuing the Order. The Order does not prescribe a legal standard "that is not otherwise expressly provided by or clearly and obviously inferable" from the enabling statute. Metromedia, Inc. v. Director, Division of Taxation, 97 N.J. 313, 331, 478 A.2d 742 (1984). It does not represent a material and significant change from a clear past agency position. Ibid. Finally, it reflects informal agency action of the type which has long been permitted without rulemaking. Texter v. Human Services Dept., 88 N.J. 376, 383-84, 443 A.2d 178 (1982).
Affirmed.