607 A.2d 1019

IN THE MATTER OF FARMERS' MUTUAL FIRE ASSURANCE
ASSOCIATION OF NEW JERSEY.

Superior Court of New Jersey
Appellate Division

Argued April 28, 1992—Decided May 22, 1992.

608

Before Judges ANTELL, BAIME and THOMAS.

*Susan Stryker* argued the cause for appellant (*Hannoch Weisman,* attorneys; *James J. Shrager* of counsel; *Susan Stryker, Howard K. Uniman,* and *Richard J. Van Wagner* on the brief).

*Marilyn S. Silvia,* Deputy Attorney General, argued the cause for respondent (*Edward J. Dauber,* Acting Attorney

General, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel; *Marilyn S. Silvia* on the brief).

The opinion of the court was delivered by

BAIME, J.A.D.

This appeal presents novel questions under the Fair Automobile Insurance Reform Act of 1990 (FAIR Act). *N.J.S.A.* 17:33B–1 to –63. Among other things, the Act requires the Property Liability Insurance Guaranty Association (PLIGA) to collect assessments from its members to be used to relieve the deficit of the New Jersey Full Insurance Underwriting Association (JUA). *N.J.S.A.* 17:30A–8a(3)(d). The Act empowers the Commissioner of Insurance to exempt, abate or defer an assessment if an insurer is at risk because of its unsafe or unsound financial condition. *N.J.S.A.* 17:33B–55 and *N.J.S.A.* 17:33B–56. At issue here is whether an insurer is entitled to a hearing on its request for an exemption, abatement or deferral. Also in question is whether the statute is constitutionally infirm because it confers unbridled discretion upon the Commissioner in deciding whether to exempt, abate or merely defer the obligation of a financially distressed insurer. We hold that the FAIR Act affords an insurer the right to a hearing on its claim for an exemption. We also conclude that the statute is not unconstitutionally vague. However, we are persuaded that administrative regulations are necessary to guide the Commissioner in the exercise of his statutory powers.

I.

The issues presented can best be understood in the context of a brief overview of New Jersey's experience in regulating automobile insurance. A more exhaustive exposition appears in *State Farm Mut. Auto Ins. Co. v. State*, 124 *N.J.* 32, 590 *A.*2d 191 (1991) and *Matter of Am. Reliance Ins. Co.*, 251 *N.J.Super.* 541, 598 *A.*2d 1219 (App.Div.1991). We focus here upon the sections of the FAIR Act designed to alleviate the JUA's debt.

The JUA was created by the New Jersey Automobile Full Insurance Availability Act (*N.J.S.A.* 17:30E–1 to –24). The objective of the statutory scheme was to abandon the assigned risk plan (*N.J.S.A.* 17:29D–1), under which the Commissioner apportioned high-risk drivers among all automobile insurers doing business in New Jersey, and to replace it with a more extensive system of allocation with coverage at rates equivalent to those charged in the voluntary market. *State Farm Mut. Auto Ins. Co. v. State,* 124 *N.J.* at 40–41, 590 *A.*2d 191. Unfortunately, the JUA plan did not achieve its goals. Among other failures, the JUA accumulated a deficit of $3.3 billion in unpaid claims and other losses.

The FAIR Act is the Legislature's most recent effort to resolve these problems. We need not describe the newly adopted procedure designed to "depopulate" the JUA and provide economical coverage to "standard" and "non-standard" risk drivers. *See Matter of Market Transition Facility,* 252 *N.J.Super.* 260, 599 *A.*2d 906 (App.Div.1991). Nor need we examine all of the Act's provisions designed to create a funding mechanism to relieve the JUA's debt. *See Matter of Am. Reliance Ins. Co.,* 251 *N.J.Super.* at 546–47, 598 *A.*2d 1219. Suffice it to say, new sources of funding were created, including revenues derived from a surtax upon automobile insurance premiums, *N.J.S.A.* 17:33B–49, fees on lawyers, doctors, and auto body repair businesses, (*N.J.S.A.* 17:33B–58 to –63), and most significant in the context of this appeal, the imposition of assessments on many types of insurers, *N.J.S.A.* 17:30A–8a(9) and 8a(10).

As we mentioned earlier, assessments are collected by PLIGA. They are measured by the proportion the net direct written New Jersey premiums of the insurer for the preceding calendar year bear to the net written New Jersey premiums of all PLIGA members. These assessments are to be applied exclusively to the JUA debt. The FAIR Act denominates these assessments as "loans" and requires that they be paid into the New Jersey Automobile Insurance Guaranty Fund (Auto Fund).

*N.J.S.A.* 17:30A–8a(10). Although the FAIR Act prohibits dollar-for-dollar "pass throughs" of the newly created surtaxes and assessments, *N.J.S.A.* 17:30A–16b and *N.J.S.A.* 17:33B–51, the Legislature provided that "automobile insurers are entitled to earn an adequate rate of return through the ratemaking process," *N.J.S.A.* 17:33B–2g, and the courts have reaffirmed that overarching constitutional prescription with regard to all affected carriers. *See State Farm v. State,* 124 *N.J.* at 61, 590 *A.*2d 191; *Matter of Am. Reliance Ins. Co.,* 251 *N.J.Super.* at 556, 598 *A.*2d 1219.

The principal method of assuring the financial integrity of insurers is rate relief. In addition, the FAIR Act contains "stop-gap" measures designed to safeguard insurance companies from the risk of insolvency. In particular, if an insurer is at risk because of an "unsafe or unsound financial condition," the Commissioner may "suspend" (1) its obligation to accept what would be its allocation of assigned risks, *N.J.S.A.* 17:33B–23 and –24, and (2) its obligation to issue or renew automobile policies, *N.J.S.A.* 17:33B–27 and –28. The Commissioner may "exempt, abate or defer" (1) the insured's obligation to pay the premium surtax, *N.J.S.A.* 17:33B–52 and –53, and (2) its obligation to remit PLIGA assessments, *N.J.S.A.* 17:33B–55 and –56). As we noted in *Matter of Am. Reliance Ins. Co.,* separate sections either "mandate" application of these statutory remedies, *see N.J.S.A.* 17:33B–23; *N.J.S.A.* 17:33B–27; *N.J.S.A.* 17:33B–52; *N.J.S.A.* 17:33B–55, or confer discretion upon the Commissioner to take that course on his own initiative, *N.J.S.A.* 17:33B–24; *N.J.S.A.* 17:33B–28; *N.J.S.A.* 17:33B–53; *N.J.S.A.* 17:33B–56, depending upon whether the pertinent financial danger test is satisfied. *Matter of Am. Reliance Ins. Co.,* 251 *N.J.Super.* at 547, 598 *A.*2d 1219. As we will observe later in our opinion, the parallel language of these statutory remedies is significant. We repeat that each statutory remedy contains a mandatory section, which requires the Commissioner to grant relief, and a discretionary section, which permits the Commissioner to adopt this course on his own initiative.

The mandatory-discretionary dichotomy appears in all of these sections. *N.J.S.A.* 17:33B–55 and *N.J.S.A.* 17:33B–56 are illustrative of the two kinds of statutory remedies. Although we are concerned here with *N.J.S.A.* 17:33B–55, our consideration of the statutory scheme would not be complete without examining *N.J.S.A.* 17:33B–56. Because of the importance we attach to considering each section in its full context, we quote both statutes verbatim. *N.J.S.A.* 17:33B–55 reads:

a. The commissioner shall, after hearing, provide that the New Jersey Property–Liability Guaranty Association exempt, abate or defer, in whole or in part, the assessment on any member insurer imposed pursuant to paragraph (9) of subsection a. of section 8 of *P.L.*1974, *c.* 17 (*C.*17:30A–8), if the insurer is in an unsafe or unsound financial condition.

b. If an insurer requests exemption, abatement or deferral and avers that there is an immediate need to exempt, abate or defer the payment of assessments pursuant to paragraph (9) of subsection a. of section 8 of *P.L.*1974, *c.* 17 (*C.*17:30A–8), because payment would result in the insurer being in an unsafe or unsound financial condition, the insurer's obligation to pay such assessments shall be exempted, abated or deferred beginning on the 10th business day after the insurer has filed the request and supporting documentation with the commissioner, unless within that time, the commissioner finds that continued payment of assessments will not result in the insurer being in an unsafe or unsound financial condition.

c. Any exemption, abatement or deferral pursuant to subsection a. or b. of this section shall continue until the commissioner, upon the commissioner's own motion or upon request by the insurer or any other interested party, after providing opportunity for a hearing, orders its revocation.

d. For the purposes of this section, an insurer shall be deemed to be in an unsafe or unsound financial condition if the commissioner finds the insurer to have a ratio of annual net premiums written to surplus as to policyholders that threatens the financial health of the insurer.

*N.J.S.A.* 17:33B–56 provides:

The commissioner may provide that the association exempt, abate or defer, in whole or in part, the assessment on any member insurer imposed pursuant to paragraph (9) of subsection a. of section 8 of *P.L.*1974, *c.* 17 (*C.*17:30A–8), if the commissioner, in his discretion, determines that payment of the assessment will result in an insurer's financial condition becoming unsafe or unsound. In making this determination, the commissioner shall consider the following factors:

a. The insurer's ratio of annual net premiums written to surplus as to policyholders; and

b. Whether the insurer would experience:

(1) an adverse change in its rating by A.M. Best and Company, Dun and Bradstreet, Moody's or Standard and Poor's;

(2) financial ratios outside the acceptable ranges as established by the National Association of Insurance Commissioners or the chief financial officer of the Department of Insurance of this State; or

(3) a net reduction to the insurer's surplus as to policyholders greater than 25% during a period of two years or less.

Any exemption, abatement or deferral pursuant to this section shall continue until the commissioner, upon the commissioner's own motion or upon request by the insurer or any other interested party, after providing opportunity for a hearing, orders its revocation.

## II.

We now turn to the facts of this case. Farmers' Mutual Fire Assurance Association of New Jersey (Farmers) is a small mutual company licensed to write insurance in New Jersey. It does not write automobile insurance, but is nonetheless a member of PLIGA. *See N.J.S.A.* 17:30A–5f; *N.J.S.A.* 17:30A–6. Farmers was initially assessed $510,759.27 for the 1990 calendar year. PLIGA subsequently recalculated the 1990 assessment, increasing it to $529,982.76. Farmers' 1991 assessment is also $529,982.76.

On June 22, 1990, Farmers applied to the Commissioner for an exemption based on its precarious financial position. In its initial request for relief, which was later supplemented with additional information bolstering its application, Farmers noted that the 1990 assessment represented over 66% of its 1989 net income and nearly 20% of its surplus. After payment of its assessment, Farmers' premium to surplus ratio would rise above the accepted 3.0:1 test relied upon by the Commissioner in determining risks to an insurer's financial viability.

On August 10, 1990, the Commissioner issued an order in which he agreed that Farmers was entitled to relief. In reaching this conclusion, the Commissioner emphasized that payment of the assessment would exceed the 3.0:1 test and that other accepted measures of financial health utilized by the insurance industry indicated the company's financial condition was suffi-

ciently poor to raise concern. The Commissioner noted that the substantial difference between Farmers' direct premiums written and net premiums written indicated "a substantial reinsurance program is utilized by [the company] to improve its surplus position." However, the Commissioner determined that an exemption was unwarranted. Instead, the Commissioner directed Farmers to remit $100,000 of the assessment with the remainder to be deferred.

Farmers applied for reconsideration and a hearing. In support of its application, Farmers cited A.M. Best Company's action in lowering the company's rating below minimum standards based upon its $411,000 contingent liability. Attached to Farmers' request for a complete exemption was Best's letter, which stated in pertinent part:

> This letter is your notification that after review of your company's 1990 statutory financial results and operating performance, we have assigned a Best's Rating of NA 7 (Below Minimum Standards) and Financial Size Category of Class III. This rating assignment reflects the fact that your company meets our minimum size and experience requirements, but does not meet the minimum standards for a Best's Rating of "C-." This rating assignment is largely due to the company's weak surplus position and relative high leverage, which in our view will only deteriorate due to the New Jersey FAIR plan assessments for which the company still owes a balance of $411,000 from 1990's assessment.

The Commissioner subsequently issued an amended order, sustaining his prior determination. The Commissioner again concluded that Farmers' assessment obligation, other than the $100,000 required to be remitted, was to be deferred subject to quarterly review. The Commissioner added that the Department of Insurance would (1) notify Farmers if it determined that payment of the deferred amount was feasible, (2) provide an opportunity for a hearing in that event, and (3) grant it 60 days to make the payment if ordered.

Farmers also sought an exemption of its 1991 assessment. The Commissioner denied Farmers' request, but agreed to defer the entire amount pending review at a later date. In support of his determination, the Commissioner found that "payment of the assessment or any part thereof [would] place Farmers in an

unsafe or unsound financial condition." Noting the possibility that Farmers' financial condition might some day be "restored," the Commissioner refused to exempt the company from its obligation. The Commissioner concluded that it would be "inappropriate to forgive payment of the 1991 assessment through exemption or abatement [which he opined could not be revoked retroactively] and that the wisest course [was to] defer such obligation." Finally, the Commissioner added that notice and an opportunity for a hearing would be provided if the Department were to require that the amount deferred be paid at some future time.

Farmers filed separate appeals which we later consolidated. In related points, Farmers asserts that it was denied a hearing and that the Commissioner acted in an arbitrary and capricious manner. Farmers also contends that *N.J.S.A.* 17:33B–55 and *N.J.S.A.* 17:33B–56 are unconstitutionally vague because they do not provide standards to guide the Commissioner in determining whether to exempt, abate or defer the assessment of a financially ailing insurer. Because we are convinced that a remand is necessary, we consider only Farmers' argument pertaining to the necessity of a hearing and its challenge to the constitutionality of the two statutes.

### III.

We first address Farmers' argument that the FAIR Act requires a hearing on a petition for an exemption, abatement or deferral of an insurer's PLIGA assessment. As we noted earlier, Farmers' request for a hearing was denied by the Commissioner. The position of the Commissioner is somewhat prolix. He contends that an insurer is entitled to a hearing only where it is in an unsafe or unsound financial condition before paying the assessment, and only where he, the Commissioner, takes the initiative to grant such relief. According to the Commissioner, there is no right to a hearing where the insurer initiates the process by requesting relief from a PLIGA assess-

ment on the basis that it would be in an unsafe or unsound financial position if it were to pay its obligation.

The Commissioner's contention is based upon the differences in phraseology of subsection a. and b. of *N.J.S.A.* 17:33B–55. Subsection a. provides an unqualified right to a hearing where the insurer "is in an unsafe or unsound financial condition." *N.J.S.A.* 17:33B–55a. In contrast, subsection b., which does not provide for a hearing, is triggered when "an insurer requests [an] exemption, abatement or deferral and avers that there is an immediate need [for such relief] ... because payment would result [in placing the carrier] in an unsafe or unsound financial position." *N.J.S.A.* 17:33B–55b. Citing these differences in the statutory language, the Commissioner asserts that the right to a hearing guaranteed by subsection a. is not triggered by an insurer's request, but rather comes into play only where he takes the initiative and decides to exempt, abate or defer the carrier's obligation because it is currently in an unsafe or unsound condition.

■ We hold that the FAIR Act requires the Commissioner to conduct a hearing where an insurer applies for an exemption, abatement or deferral of its PLIGA assessment because it is either currently financially unsound or would be if it were to remit payment of its obligation. To be sure, the relief provisions we have cited, including *N.J.S.A.* 17:33B–55 and *N.J.S.A.* 17:33B–56, are not a model of clarity. However, we read these statutes as authorizing the Commissioner to initiate the process to grant relief, in which case, no hearing is required (*N.J.S.A.* 17:33B–56), and to permit insurers to apply for the statutory remedy, in which event, the right to a hearing is statutorily guaranteed (*N.J.S.A.* 17:33B–55).

In our view, subsection a. of *N.J.S.A.* 17:33B–55 provides an unqualified right to a hearing where an insurer seeks relief from its obligation to pay its PLIGA assessment. We construe subsection b. as authorizing interim or *pendente lite* relief where an insurer both requests an exemption, abatement or

deferral and alleges that there is an immediate need for relief. *N.J.S.A.* 17:33B–55b. Under subsection b., the insurer's obligation is automatically stayed "beginning on the 10th business day" after the application is filed, "unless within that time, the [C]ommissioner finds that continued payment of assessments will not result in the insurer being in an unsafe or unsound financial condition." *Ibid.* When interim relief is sought pursuant to subsection b., a hearing would obviously be impractical given the statutory time constraint. As we see it, the intent was to preserve the status quo until the hearing provided by subsection a. is conducted.

Our interpretation of *N.J.S.A.* 17:33B–55 is consonant with the overall objectives of the FAIR Act to "provide a healthy and competitive automobile insurance system...." *N.J.S.A.* 17:33B–2g. Historically, "insurance companies, like banks, were always considered financial bulwarks." *State Farm Mut. Auto Ins. Co. v. State*, 124 *N.J.* at 68, 590 *A.*2d 191 (Garibaldi, J., concurring). Unfortunately, that is no longer true. *Ibid.* Current economic conditions compound this concern. As pointed out by Justice Garibaldi in her concurring opinion in *State Farm Mut. Auto Ins. Co. v. State*, "[a]lthough the size of the accumulated unpaid debt of the [JUA] is deplorable, the failure or withdrawal of insurance companies providing coverage in this state would prove even more damaging." *Ibid.* The Legislature clearly recognized that a competitive and economical insurance system depends in part on the financial viability of insurers. We are convinced that the Legislature intended to grant a hearing to a financially ailing insurer on its request for relief from its obligation to pay its PLIGA assessment.

The Commissioner's position advances form over substance and does not further the Legislature's objectives in enacting the FAIR Act. In essence, the Commissioner contends that insurers who request relief are not entitled to a hearing, but those who do not are statutorily guaranteed one. It is incongruous to require a hearing for insurers who do not want one, but refuse a hearing to those who do. We can think of no reason why the

Legislature would wish to deny a hearing to those seeking relief, but provide one to insurers who are silent on the subject. Moreover, the distinction between current and future financial distress is highly illusory. For example, if Farmers had paid the 1990 assessment without requesting immediate relief, its premium to surplus ratio would have exceeded the 3.0:1 level deemed by the Commissioner to be the benchmark for determining whether an insurer is in a financially unsafe or unsound condition. Under the Commissioner's interpretation of the statute, Farmers would then be entitled to a hearing, but not before. We cannot imagine that any legitimate public policy would be furthered by this course.

■■■ Although we find that Farmers is entitled to a hearing, we have no occasion to determine whether a full trial type proceeding is necessary. Under the Administrative Procedure Act (APA) (*N.J.S.A.* 52:14B-1 to -15), the Commissioner has the right to make the discretionary decision whether there are contested material issues of fact requiring an evidentiary hearing. *See N.J.S.A.* 52:14F-7; *see also In re Township of Warren,* 247 *N.J.Super.* 146, 159, 588 *A.*2d 1227 (App.Div.1991); *Hills Development Co. v. Bernards Tp.,* 229 *N.J. Super.* 318, 341, 551 *A.*2d 547 (App.Div.1988). An evidentiary hearing is mandated only when the proposed administrative action is based on disputed adjudicatory facts. *High Horizons Dev. Co. v. State Dept. of Transp.,* 120 *N.J.* 40, 49–50, 575 *A.*2d 1360 (1990); *Matter of Request for Solid Waste Util. Customer Lists,* 106 *N.J.* 508, 517, 524 *A.*2d 386 (1987); *Bally Mfg. Corp. v. N.J. Casino Control Comm'n,* 85 *N.J.* 325, 334, 426 *A.*2d 1000, *appeal dismissed,* 454 *U.S.* 804, 102 *S.Ct.* 77, 70 *L.Ed.*2d 74 (1981); *Quad Enterprises v. Paramus Bor.,* 250 *N.J.Super.* 256, 263, 593 *A.*2d 1227 (App.Div.1991); *Spalt v. New Jersey D.E.P.,* 237 *N.J.Super.* 206, 212, 567 *A.*2d 264 (App.Div.1989), *certif. denied,* 122 *N.J.* 140, 584 *A.*2d 213 (1990). Despite the voluminous record, we cannot fairly say whether the material facts are in dispute. Instead, we remand the matter to the Commissioner for this purpose.

## IV.

We next consider Farmers' argument that the FAIR Act is unconstitutionally vague because it contains no standards to guide the Commissioner in determining whether a financially distressed insurer should be granted an exemption, an abatement or merely a deferral. We find no constitutional infirmity.

To avoid the pitfall of vagueness, a statute must enable a person of common intelligence to understand its essential terms. *State v. Lashinsky*, 81 *N.J.* 1, 17, 404 *A.*2d 1121 (1979). "The determination of vagueness must be made against the contextual background of the particular law and with a firm understanding of its purpose." *State v. Cameron*, 100 *N.J.* 586, 591, 498 *A.*2d 1217 (1985). Our Supreme Court has said that "the standard to determine the vagueness of a law is not one that can 'be mechanically applied.'" *Ibid.* (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 *U.S.* 489, 498, 102 *S.Ct.* 1186, 1193, 71 *L.Ed.*2d 362, 371 (1982). Rather, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depend in part on the nature of the enactment." *Ibid.*

Here, we are concerned with economic regulation. It is recognized that economic legislation "is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant [authorities] in advance of action." *State v. Cameron*, 100 *N.J.* at 592, 498 *A.*2d 1217. "Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 *U.S.* at 498, 102 *S.Ct.* at 1193, 71 *L.Ed.*2d at 371–72. For these reasons, it has been said that "[a] commercial regulatory statute can be held unconstitutionally vague only if it is 'substan-

tially incomprehensible.'" *Matter of Loans of N.J. Property Liability Ins. Guar. Ass'n,* 124 *N.J.* 69, 78, 590 *A.*2d 210 (1991).

Against this backdrop, we are satisfied that the statutory language, though not an "impeccable specimen[ ] of draftsmanship," *Petition of Soto,* 236 *N.J.Super.* 303, 327, 565 *A.*2d 1088 (App.Div.1989), *certif. denied,* 121 *N.J.* 608, 583 *A.*2d 310 (1990), *cert. denied,* 496 *U.S.* 937, 110 *S.Ct.* 3216, 110 *L.Ed.*2d 664 (1990) (as quoted in *In Review of Health Care Admin. Bd. v. Finley,* 168 *N.J.Super.* 152, 167, 402 *A.*2d 246 (App.Div.1979), *aff'd,* 83 *N.J.* 67, 415 *A.*2d 1147 (1980)), is sufficiently precise to withstand constitutional attack. The Legislature "may commit a subject to the judgment of an administrative agency with a statement of the goal to be reached rather than the path to be followed to reach it." *In re Trenton Bd. of Ed.,* 176 *N.J.Super.* 553, 562, 424 *A.*2d 435 (App.Div.1980), *aff'd,* 86 *N.J.* 327, 431 *A.*2d 808 (1981) (citing *Shelton College v. State Bd. of Ed.,* 48 *N.J.* 501, 516–18, 226 *A.*2d 612 (1967). In that context, we discern no constitutional violation in the Legislature's failure to draw statutory lines directing the precise remedy to be used by the Commissioner in addressing the financial condition of an ailing insurer.

■ However, this does not end our inquiry. The simple and overriding fact is that the decision whether to exempt, abate or defer an insurer's PLIGA assessment may have an enormous impact on the carrier's financial viability. Moreover, the discretion conferred upon the Commissioner in choosing which remedy should be applied is boundless under the statute. In determining if rulemaking is required, "the threshold consideration is whether the enabling statute is itself sufficiently detailed to obviate the need for further regulation." *613 Corp. v. State, Div. of State Lottery,* 210 *N.J.Super.* 485, 497, 510 *A.*2d 103 (App.Div.1986); *see also Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 329, 478 *A.*2d 742 (1984). While administrative agencies ordinarily enjoy discretion in choosing the procedures most suitable to their regulatory aims, "[e]stablish-

ing ... policy by adjudication may suffer from ... [several] defects." *Crema v. N.J. Dept. of Environmental Protection,* 94 *N.J.* 286, 300 n. 11, 463 *A.*2d 910 (1983).

First, parties to the adjudication may not have had fair notice or a reasonable opportunity to anticipate and prepare to address the policies that will govern the proceedings. Second, persons who are not parties to the adjudication may have substantial interests at stake that can be affected by the adjudication but that are not adequately expressed or presented by the actual parties or fully considered by the agency. Third, establishing administrative policy by adjudication may force the parties to bear a disproportionate share of the cost of resolving issues of general applicability.

Within this analytical framework, we are convinced that the breadth of the legislative mandate, the complexity and sensitivity of the subject matter, and the interests of fairness and uniformity call for the adoption of administrative regulations containing standards to guide the Commissioner in determining which of the three statutory remedies should be used. *State, Dept. of Environmental Protection v. Stavola,* 103 *N.J.* 425, 436 n. 2, 511 *A.*2d 622 (1986). This is consistent with the "judicial recognition that agency rulemaking may be necessary both 'to inform the public and guide the agency in discharging its authorized function.' " *Holmdel Builders Ass'n v. Township of Holmdel,* 121 *N.J.* 550, 577–78, 583 *A.*2d 277 (1990) (quoting *Lower Main Street Assocs. the New Jersey Hous. & Mortgage Fin. Agency,* 114 *N.J.* 226, 235, 553 *A.*2d 798 (1989). Articulation of standards governing the Commissioner's discretionary decisions will serve to "assure the faithful execution of the legislative mandate." *Holmdel Builders Ass'n v. Township Holmdel,* 121 *N.J.* at 578, 583 *A.*2d 277. This is of vital importance to financially troubled insurance companies and the consumer public.

We therefore conclude that agency rulemaking is reasonably required to fulfill the legislative purpose of *N.J.S.A.* 17:33B–55 and *N.J.S.A.* 17:33B–56.

The matter is remanded for further proceedings consistent with this opinion.